# VERMILLION *v.* BALTIMORE & OHIO RAILROAD COMPANY.*

RAILROADS; MASTER AND SERVANT; NEGLIGENCE; FELLOW SERVANT; APPEAL AND ERROR.

1. In an action against a railroad company equipped with a manual block signaling system, by an engineer of one of its passenger trains, who was injured by an extra train running into his train while the latter was at a station discharging and taking on passengers, it was *held*, on a review of the evidence, that the accident was not caused by the negligence of the train despatcher.

2. The train despatcher of a railroad company, like its higher officers, must depend upon train men, station agents, and operators in the movement of trains, and so long as the company exercises reasonable prudence and care in the selection of such employees and in

---

*\*Master and Servant—Negligence—Fellow Servant.*—In the following editorial notes various questions as to liability of master for negligence of fellow servant are discussed and authorities presented: On the general question, what servants are deemed to be in the same common employment apart from statutes, where no questions as to vice principalship arises, see note to *Sofield* v. *Guggenheim Smelting Co.* 50 L.R.A. 417; On vice principalship considered with reference to the superior rank of a negligent servant, note to *Stevens* v. *Chamberlain*, 51 L.R.A. 513; For a discussion of vice principalship as determined with reference to the character of the act which caused the injury, note to *Lafayette Bridge Co.* v. *Olsen*, 54 L.R.A. 33; As to liability of master for injury to vice principal by negligence of servant, note to *McGrory* v. *Ultima Thule, A. & M. R. Co.* 23 L.R.A.(N.S.) 301; Upon the question whether train despatcher or telegraph operator is a fellow servant of trainmen, notes to *Little Rock & M. R. Co.* v. *Barry*, 25 L.R.A. 386; *Ricker* v. *Central R. Co.* 7 L.R.A.(N.S.) 651; *Northern P. R. Co.* v. *Dixon*, 48 L. ed. U. S. 1006; and as to when railroad conductors and engineers are fellow servants with other employees, note to *Northern P. R. Co.* v. *Hambly*, 38 L. ed. U. S. 1009.

providing them with proper equipment and a safe place in which to work, it has satisfied its duty in providing for their safety.

3. The engineer of a railroad company is the fellow servant of the engineer of another train, where both are servants of the same company and both trains are owned and operated by it.

4. The operator of a block signal, who regulates the movements of railroad trains, is a fellow servant of an engineer of one of the trains, where both are employees of the same railroad company.

5. An application for the allowance of a writ of error to remove an appeal to the Supreme Court of the United States, in a cause in which over $5,000 was involved, was *denied*, where the appeal was decided by this court subsequent to January 1, 1912, the date the act of Congress of March 3, 1911 (36 Stat. at L. 1087, chap. 231), known as the Judicial Code, took effect. (Following *Washington Home* v. *American Secur. & T. Co.* ante, 421.)

No. 2358. Submitted February 12, 1912. Decided March 4, 1912.

HEARING on an appeal by the plaintiff from a judgment of the Supreme Court of the District of Columbia, on a verdict directed by the Court, in an action to recover damages for personal injuries.                                   *Affirmed.*

The COURT in the opinion stated the facts as follows:

This is an appeal from a judgment of the supreme court of the District of Columbia entered upon a directed verdict, in which the court, at the close of the plaintiff's testimony, directed the jury to return a verdict in favor of the defendant, the Baltimore & Ohio Railroad Company. The suit was for the recovery of damages for personal injuries sustained in a railroad wreck. It appears that the plaintiff, Benjamin L. Vermillion, was an engineer upon one of defendant's regular passenger trains, known as train number 66. While this train was discharging and taking on passengers at Terra Cotta station on Sunday, December 30, 1906, at about 6:38 P. M., an extra train drawn by engine No. 2,120 collided with train 66, causing the injuries complained of by plaintiff. Suit was not instituted until more than one year after the accident; plaintiff was therefore barred from proceeding under the employers'

liability act, 34 Stat. at L. 232, chap. 3073, U. S. Comp. Stat. Supp. 1909, p. 1148.

It appears that on the evening of the accident train 66 left Washington junction on schedule time at 4:47 P. M., due to arrive at Washington at 6:25 P. M., its route from Washington. junction being over what is known as the Metropolitan branch of the defendant company's road, which, at the place of the accident, was a double-track line. There were eight regular stops to be made. There were also eight flag stations, at which passenger trains might be required to stop on week days. On Sundays, in addition to the regular stops, the train was required to stop on flag signals at any of twenty-nine other stations shown on the schedule. On the evening of the wreck, there was a dense fog, making it difficult for trainmen to observe signals.

. Train 2,120 did not leave Washington junction until 5:27 or 5:28, according to the testimony of the engineer in charge. Between Washington junction and this city there are sixteen open telegraph stations. Nine of these stations were known as reporting stations. From these stations the train despatcher in Baltimore was kept informed of the movement of trains along the lines. The operator at each of these stations immediately reported to the despatcher the time of each train that passed his station, and the despatcher would keep a record of the same on his train sheet. In this manner the despatcher was kept constantly informed of the relative position of trains along the line. Train men in the operation of their trains were also governed by the rules issued by the company for the government of the operating department. They were also furnished with time-tables, which contained "authority) for the movement of trains, subject to the rules and the schedules of trains, with special instructions relating thereto."

In addition to these precautions there was established along this line of road what is known as the manual block system. Under this system the road was divided into blocks of definite limits, the use of which by trains was controlled by block signals. The blocks extended from one open telegraph office to

another, at each of which offices block signals were displayed to trains by means of a semaphore operated by the telegraph operator in charge of the station. In daytime signals were given by means of the position of the blade of the semaphore, and at night by means of the color of the light displayed. The horizontal position of the blade in the daytime had the same signification as a red signal at night, both warning the engineer to stop his train. The blade of the semaphore dropped all the way down in the daytime was equivalent to a white light at night, meaning to the engineer, "Proceed, the block is clear;" while the blade dropped half way down in the daytime indicated the same as a green light at night, indicating to the engineer, "Proceed with caution, a train is ahead." The normal position of the signal is red, and when the operator wishes to display any other signal he is required to pull up a lever and hold it with his hand until the train has passed.

It appears that train 66 continued to lose time after leaving Washington junction, reaching Silver Spring at 6:21. Train 2,120, though it left Washington junction forty minutes behind 66, left Silver Spring at 6:28, or seven minutes behind 66. Takoma station was situated between Silver Spring and Terra Cotta, $1\,^2/_{10}$ miles from Silver Spring and 2 miles from Terra Cotta, where the wreck occurred. This, however, was what was known as a day station, which was closed usually at 6:30 in the evening; it appearing, however, that the agents at day stations were not permitted to close such stations until they had received final notice from the train despatcher, or while there was a train in their blocks. It was an open telegraph station, but not a reporting station from which reports were made to the train despatcher of the passage of trains, unless something unusual occurred, which called for a special report. When 2,120 approached Silver Spring the engineer was given a double green signal, which indicated, as testified to the train despatcher, that he should look out for a train immediately ahead,—a work train for instance, or a train using a cross over between the two main tracks at some point between where he receives the double green signal and the next end of the block.

While the double green signal, under the rules of the company, permitted the train to enter the block, it was a caution to the engineer to move slowly, and keep his train under control, and look out for the train ahead.

The engineer on train 2,120 testified that it passed Silver Spring station at 6:31, and, knowing that the time of closing at Takoma station was 6:30, he supposed the Takoma agent had left for the night; that he accepted the double green signal as covering the block between Silver Spring and the next reporting station at University, neither Takoma nor Terra Cotta being reporting stations; that when he passed Takoma he looked for a signal and saw none; and that as he approached Terra Cotta, where he expected to find the work train switching, as per double green signal received at Silver Spring, he looked for a signal from the flagman, and saw none. Thinking that the work train had left the block, he opened the throttle and ran into the passenger train, causing the wreck. The agent at Takoma testified that the red signal was displayed when 2,120 passed, and, according to the evidence, the agent immediately thereafter telegraphed the train despatcher in Baltimore to the effect that 2,120 had passed his red signal at Takoma while 66 was still in the block.

Mr. *A. E. L. Leckie,* Mr. *Joseph W. Cox,* and Mr. *John A. Kratz,* Jr., for the appellant.

Mr. *George E. Hamilton,* Mr. *John W. Yerkes,* and Mr. *John J. Hamilton* for the appellee.

Mr. Justice VAN ORSDEL delivered the opinion of the Court:

From these facts we think the train despatcher was not responsible for the negligent act that contributed to the accident. He, like the higher officers of the company, must depend upon train men, station agents, and operators in the movement of trains, and, so long as the company exercises reasonable prudence and care in the selection of such employees, and in

providing them with proper equipment and a safe place in which to work, it has fulfilled its duty in providing for their safety.

When the operator at Silver Spring cautiously gave the double green signal and permitted 2,120 to pass, the despatcher knew that the operator at Takoma was still on duty, fully advised of the respective locations of the trains, and, according to the rules, should display the red signal forbidding 2,120 to enter the block between Takoma and University. In view of the fact that 66 had cleared the block between Silver Spring and Takoma when 2,120 passed, seven minutes' difference between the passing time of the trains at Silver Spring was not so short a period, owing to the close proximity of the stations, as to charge the despatcher with notice of danger, if the engineer on 2,120 and the operator at Takoma performed their respective duties, which he had a right to assume they would. It should be remembered that the schedule time of trains between Silver Spring and Takoma was only two minutes, and the despatcher knew that, when 2,120 passed Silver Spring, 66 had cleared the block between there and Takoma; hence he had a right to rely upon the operator at Takoma protecting the block to University, the next reporting station.

Giving plaintiff the benefit of all doubt arising from the juggling of minutes and seconds by the various witnesses, the contributing cause of this accident lies between the operators at Silver Spring and Takoma and the engineer of 2,120. It is not important to definitely locate the responsibility, since they were all fellow servants of the plaintiff. But it is urged that the operator of a block signal is a vice-principal, and in that he regulates the movement of trains. His relation to the train men is not different from that of the station agent, where block signals are not in use, who regulates the movement of trains in and out of his stations, either by a flag or a written order handed to the engineer or conductor. The display of the wrong flag, or the use of a wrong word in the order, may cause injury to a train man, but it has never been held in such cases

that the relation between the agent and the train man was other than that of fellow servants.

In *Northern P. R. Co.* v. *Dixon,* 194 U. S. 338, 48 L. ed. 1006; 24 Sup. Ct. Rep. 683, where a train man was injured through the failure of an operator to report to the despatcher the passage of a train, the court, holding that they were fellow servants, said: "In a recent case in this court, *New England R. Co.* v. *Conroy,* 175 U. S. 323, 44 L. ed. 181, 20 Sup. Ct. Rep. 85, it was said (p. 328): 'We have no hesitation in holding, both upon principle and authority, that the employer is not liable for an injury to one employee occasioned by the negligence of another engaged in the same general undertaking; that it is not necessary that the servants should be engaged in the same operation or particular work; that it is enough, to bring the case within the general rule of exemption, if they are in the employment of the same master, engaged in the same common enterprise, both employed to perform duties tending to accomplish the same general purposes, or, in other words, if the services of each in his particular sphere or department are directed to the accomplishment of the same general end.' Tested by this, it is obvious that the local operator was a fellow servant with the fireman. They were 'engaged in the same general undertaking,'—the movement of trains. They were called upon 'to perform duties tending to accomplish the same general purposes,' and 'the services of each in his particular sphere or department were directed to the accomplishment of the same general end.' The fireman who shovels coal into the fire box of the engine is not doing precisely the same work as the engineer, neither is the conductor who signals to the engineer to start or to stop, nor the operator who delivers from the telegraph office at the station to the engineer orders to move, and who reports the coming and the going of trains, and yet they are all working, each in his particular sphere, towards the accomplishment of this one result,—the movement of trains." This is a concise statement of the rule of common-law liability of the master for injuries to an employee caused by the negligence of a fellow servant.

But it is insisted that this rule was modified in *Sante Fe P. R. Co.* v. *Holmes*, 202 U. S. 438, 50 L. ed. 1094, 26 Sup. Ct. Rep. 676. We find no conflict between these cases. In the later case the injury was held to have been caused by the negligence of the train despatcher, and it has generally been held that a train despatcher, having supervision of the movement of trains over a large division of road, is a vice principal.

The judgment is affirmed, with costs, and it is so ordered.

*Affirmed.*

An application by the appellant for the allowance of a writ of error to remove the cause to the Supreme Court of the United States was denied March 14, 1912, Mr. Chief Justice SHEPARD delivering the opinion of the Court:

For the reasons given in opinion filed in *Washington Home* v. *American Secur. & T. Co.* ante, p. 421, the petition is denied.

An application for the allowance of a writ of error to remove the case to the Supreme Court of the United States was denied by that court, April 29, 1912, in an opinion by Mr. Justice Holmes.